PEOPLE ex rel. LAKE PLACID CO. v. WILLIAMS, Comptroller, et al.

(Supreme Court, Appellate Division, Third Department. May 3, 1911.)

TAXATION (§ 697*)—REDEMPTION FROM TAX SALE—PERSONS ENTITLED TO REDEEM—"OCCUPANCY."

> The relator owned lots bordering on Lake Placid, on which it had built an inn, and also owned the greater parts of two lots situated in part on Moose Island in the lake and in part under the water of the lake, the parts of which nearest to the inn were from 2¼ miles to 2¾ miles distant, and which made, with the other lots, a fairly compact tract owned and cared for by the relator. The lots sold were connected with the inn and with relator's boathouse by the waters of the lake, and were used in connection with the tract of land for picnics and camping, and for the purposes of enjoyment by the members of the Lake Placid Boat Club, and there were boat landings on the two lots, and relator had expended money in repairing and improving the approaches to the lots and had put up signs forbidding shooting, etc. *Held,* that "occupancy," as defined by Tax Law (Consol. Laws 1909, c. 60) § 134, did not require that the owner should build a house and reside upon the particular part of the lands sold for taxes, and that relator, upon the occupancy shown, was entitled to redeem the lots from a tax sale.

> [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1394–1400; Dec. Dig. § 697:*

> For other definitions, see Words and Phrases, vol. 6, pp. 4897–4903; vol. 8, p. 7736.]

> Houghton and Sewell, JJ., dissenting.

Certiorari by the People of the State of New York, on the relation of the Lake Placid Company, to review the action of the Comptroller in refusing to permit the relator to redeem lands sold by the Comptroller on a tax sale. Determination of the Comptroller reversed on law and facts, and matter remitted to the Comptroller.

Argued before SMITH, P. J., and KELLOGG, SEWELL, HOUGHTON, and BETTS, JJ.

Mead & Hatt, for relator.

Thomas Carmody, Atty. Gen., for defendant Comptroller.

J. A. Kellogg, Deputy Atty. Gen., and T. Almern Griffin, for defendant Alford.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

BETTS, J. The parcels of land in question here are small pieces of land in lots 333 and 314, township 11, Old Military tract, in the town of North Elba, Essex county, N. Y. These lands with others had been purchased for the relator by Melvil Dewey, its president in 1898, and conveyed to the relator in February, 1901, by deeds duly recorded. The relator paid all tax bills presented by town tax collector, and supposed that it had paid all taxes on these lands, but through inadvertence or otherwise some payments were omitted, and the two small lots in question were sold at the tax sale of 1905 for certain taxes for a small amount thereon, assessed some time prior thereto. No notice was served upon the relator, which claims to be both owner and occupant by the purchasers at the tax sale or any person in their behalf. Relator attempted to pay the taxes within one year, but through a misunderstanding its check arrived too late for that purpose, whereupon this proceeding was had to redeem them under the statute, on the ground that they were in actual occupancy of the Lake Placid Company, the owner, and its tenants, the Lake Placid Club, during all the times subsequent to the purchase of the property in 1898 and until the date of the affidavits, which was on December 15 and December 19, 1908, and, of course, including one year from December 23, 1905, the last day of the tax sale. The purchasers at the tax sale or their representatives were allowed to file affidavits in opposition, and upon the affidavits thus submitted Deputy Comptroller Kelsey on April 1, 1909, denied the application to redeem, whereupon this certiorari proceeding was brought.

It appears from all the papers here that the relator owns lot 278 upon which its inn and many other of its buildings are, and also other lots bordering on Mirror Lake; that it owns a portion or the whole of lot 277 on East Lake, which is a part of Lake Placid, and the greater portion of lots 335, 333, 313, and 314, the last three being on Moose Island, and 335 being on the mainland nearly opposite and southeast from 314. The map submitted shows that the nearest part of the lot sold from the northeast corner of lot 314 was about two miles and a quarter from the Lake Placid Inn of relator; that the nearest part of lot 333 sold was about 2¾ miles from the inn of relator; that lots 313, 335, 333, and 314 were connected with the boathouse of relator on lot 277 by a nature's highway, being the waters of the East Lake, which is a part of Lake Placid, the nearest parts of lots 314 and 277 being only about two miles apart; that a portion of lots 333, 313, 314, 335, and 277 are all under water of the East Lake or Lake Placid; that these various lots are each one-half mile square, and lot 314 is in the third tier of lots north of 277 and the second tier east thereof, and lot 333 is in the fourth tier north of 277 and the third tier east thereof, and that lot 335 is in the second tier north of 277 and in the third tier east thereof, as I understand the points of the compass shown on the map filed on this hearing by both parties. Lots 313, 333, and 314 adjoin each other, and 335 corners up to 314 under water, 277 where relator's boathouse is, and 278 and 279 on which are the inn, club, and other buildings of relator directly adjoin, and there is water connection between those lots that do not touch each other,

so a fairly compact mass of lots belonging to, occupied by, and cared for by relator is presented. The distances as shown by the map scale put the lands much nearer together than do the affidavits submitted.

[1] The particular portions of lots 314 and 333 sold were not inclosed or cultivated, but were occupied and used by the relator in connection with other larger tracts of land which it owned, not referred to particularly in this opinion, for the purposes of enjoyment by the members of the Lake Placid Club and their guests. The relator had either erected or maintained a lumber camp on lot 335 and between lots 313 and 314 and an open camp or camps on lot 333. There was a boathouse on lot 277 and boat landings on lots 314 and 333. Over $1,000 was spent by the relator in clearing out logs and stumps and making approaches to said lots 314 and 333, wood and logs were cut and drawn, blown over timber was cleared away and taken to the mills, brush was cleaned up and burned, trails were opened, the shores were cleared, and the stumps in the water in front of each piece were cleared away, the lands were used as a part of the relator's estate for picnics and camping, and printed notices were posted all over the lands sold and other lands owned by the relator, during the last 12 years, printed with iron type on boards 10 inches by 16 inches, forbidding the discharge of firearms, cutting or breaking trees, shrubs, or vines; that picnic parties frequently occupied these lands, and that they were some of the most prized and admired of the club park area. Most of these facts are shown by the affidavits of Asa O. Gallup, Melvil Dewey, and Walter E. Thompson, and an additional affidavit is filed by Melvil Dewey and Walter E. Thompson and four other persons reciting that the lands in question were in the actual occupancy of the Lake Placid Company and the Lake Placid Club on December 26, 1906. The last day to redeem under this proceeding would be December 23 or December 24, 1906, but it is claimed by the attorneys that the date December 26, 1906, was an inadvertence and unintentional. None of the affidavits submitted on the part of the purchasers deny the ownership of the relator, and apparently all of the affiants or most of them are familiar with the locality and know where the clubhouse, inn, and principal buildings of the relator are, but their affidavits are largely conclusions and proceed on the apparent theory that "occupancy" must consist of actual residence and living upon the lands sold.

Deputy Comptroller Kelsey bases his decision upon what he understands to be the definition of or meaning of the word "occupancy," as defined in the case of People ex rel. Keyes v. Miller, 90 App. Div. 596, 86 N. Y. Supp. 189. That was a decision by this Appellate Division by a divided court of three to two in a case which in my opinion was not nearly so strong for the relator as is the case here. The Comptroller there had allowed the redemption, which determination was reversed by this court. The amount of the land owned by the club there was some 90,000 acres, of which the tract sold consisted of 570 acres. The land sold there was not in any such close touch or possession or occupancy by the club as was the land sold here. I think that the case here comes directly within the holding of this court in People

ex rel. Moynehan v. Gaus, 134 App. Div. 80, 118 N. Y. Supp. 756, affirmed 198 N. Y. 501, 92 N. E. 1097. The only difference that I can see in the two cases is that the particular lots sold in the Moynehan Case joined and formed a compact whole of the preserve of Mr. Pruyn, the owner in that case. We have seen that there is a direct nature's highway between these lots sold and many of the other lands of the relator, an actual connection and physical joining of some of the lots, and the mere fact that the lands sold do not lay next the clubhouse should not prevent the owner and occupant from redeeming its lands upon complying with the statute. Occupancy, of course, does not mean according to any definition applied to these sales that the owner or some of its representatives must build a house and reside upon the particular part of the lands sold for taxes. The provisions of section 134 of the tax law, which is as follows: "If the occupant does not reside in the tax district in which the real estate is situated the notice may be served by mail in the manner required by law in respect to notices of nonacceptance or nonpayment of notes or bills of exchange"—clearly show that the Legislature had in mind the nonresidence of the occupant.

The relator is carrying out on these lands sold the policy of the state; that is, it is keeping them in a state of nature, in much the same way that the forest preserve is being kept by the state, and, relator not having been served with a notice to redeem as required by the statute in the case of an occupant, I think that the Comptroller should have permitted a redemption.

The purchasers would have no difficulty in serving personally or otherwise upon the Lake Placid Company or the Lake Placid Club the notice required by statute to be served upon an occupant. Many of the affidavits submitted by them show knowledge of the location of the owner and occupant. I think the redemption should have been permitted, and that the determination of the Comptroller should be reversed, with $50 costs to relator.

Determination of the Comptroller reversed on law and facts, and matter remitted to the Comptroller, with $50 costs and disbursements to relator. All concur, except HOUGHTON, J., who dissents in an opinion in which SEWELL, J., concurs.

HOUGHTON, J. (dissenting). Township 11 of the Old Military tract in which the lots in controversy, numbered 314 and 333, are situated, is laid out in lots one-half mile square. The central and eastern portions of the township are largely covered by the waters of Lake Placid and Mirror Lake. In the center of Lake Placid are two islands, known as "Buck Island" and "Moose Island," and the part of the lake on the east side of these islands is known as East Lake and that part on the west is known as West Lake. Lot 278 is wholly covered by the waters of Mirror Lake, except the northeast and southeast part, and, although the record does not specifically so state, it is conceded that the relator owns this lot, and that its inn is located in the northeast quarter, on the borders of the lake. While it does not appear in evidence, it is stated in the briefs that the relator also owns

lot 277, which is all covered by that part of Lake Placid known as East Lake, except the southerly half. There is no proof that the relator owns any part of the two intervening tiers of lots before lot 314 is reached, which is the nearest to the relator's· hotel and grounds. Both the lots in controversy, 314 and 333, are located on Moose Island, and the affidavits show that by the ordinary water route from relator's inn it is 3½ miles to Moose Island, and that lot 333 is a mile further up the lake, and by direct line, according to the scale of the map printed in the record, it is fully 3 miles. These lots, therefore, can in no possible sense be deemed a part of the clubhouse grounds, separated as they are in distance and by intervening ownership in third persons of at least two tiers of half mile lots. Moose Island contains that part of five lots not under water. Relator does not claim to own any part of two of these lots, and has title only to the north part of lot 314. It does have record title, however, to all of lot 333 as well as lot 313. It appears from the record that the lots in controversy had been subdivided, and that various owners own different portions. The notice of sale states that one Crawford paid the taxes on 15 acres in the southeast quarter of lot 333, and that one Littlefield had paid the taxes on 18 acres in the south part of lot 314, and that 4 acres had been redeemed by Smith and Wicks from a tax sale. Thus apparently the relator did not own a contiguous tract of land even on Moose Island.

Confessedly the land sought to be redeemed is wild land, unfenced and uncultivated, and occupied only temporarily by pleasure parties for picnic and occasional camping purposes. Cutting fallen trees and cleaning brush and posting notices and building docks, in view of the location and situation of the property and its distance from the relator's inn and grounds, did not in my judgment constitute such occupancy as entitles the relator to redeem. The facts are wholly different from those in People ex rel. Moynehan v. Gaus, 134 App. Div. 80, 118 N. Y. Supp. 756, for there the lots sold for taxes formed a part of an entire preserve, and were contiguous to the portion actually occupied by the owner. The decision went upon the ground that the preserve was an entirety, and that the actual occupation of a part carried with it the occupation of the lots which had been sold for taxes.

As much had been done by the owner in an attempt to occupy in People ex rel. Keyes v. Miller, 90 App. Div. 596, 86 N. Y. Supp. 189, as was done by the relator in the present case, and it was there held that there was not such occupancy as entitled the owner to notice of redemption.

In Saranac Land & Timber Company v. Roberts, 125 App. Div. 333, 109 N. Y. Supp. 547, the authorities are reviewed and the character of occupancy necessary to entitle a person to redeem are discussed, and it would seem quite clear that the occupancy in the present case does not come within the rule laid down. Nor is People ex rel. Turner v. Kelsey, 180 N. Y. 24, 72 N. E. 524, to the contrary, for the only question involved in that case was whether the commission of the forest preserve could actually occupy wild lands of which it was the owner, and it was determined that such commission was as much an

occupant of such lands as an individual who actually lived upon them could be. The doctrine applied in that case has no application to individual ownership.

I think the determination of the Comptroller was right, and should be affirmed.